UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| $1,312,500.00 OF FUNDS IN THE NAME OF PETROLINA (HOLDINGS) PUBLIC LTD.; and | )  )  ) |
| | ) |
| $1,272,840.45 OF FUNDS IN THE NAME OF PETROLINA (HOLDINGS) PUBLIC LTD., | )  )  ) |
| | ) |
| Defendants. | ) |

Civil Action No. _____

## UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

COMES NOW, Plaintiff the United States of America, by and through the United States Attorney for the District of Columbia, and brings this verified complaint for forfeiture in a civil action *in rem* against the defendant properties, namely: (1) $1,312,500.00 of funds in the name of Petrolina (Holdings) Public Ltd. held at U.S. Bank 1; and (2) $1,272,840.45 of funds in the name of Petrolina (Holdings) Public Ltd. held at U.S. Bank 2. (the "Defendant Funds");[1] and alleges as follows.

## NATURE OF ACTION AND THE DEFENDANT IN REM

1.      This *in rem* forfeiture action arises out of an investigation by the Federal Bureau of Investigation ("FBI"), of a scheme to launder funds via U.S. correspondent accounts as part of an illicit procurement network for the purpose of evading U.S. sanctions related to Syria.  Joint Stock Company Sovfracht ("Sovfracht"), Petrolina (Holdings) Public Ltd. ("Petrolina"), and

---

[1]      The Defendant Funds were blocked pursuant to Executive Order 13582, described further below.

their co-conspirators employed sophisticated evasion techniques and front companies in dealing with the U.S. financial system to disguise the true nature of their illicit business dealings, as well as to protect and promote the on-going illicit procurement scheme.  Their actions evidence a long-term conspiracy to illegally procure items for, or on behalf of, sanctioned entities, in violation of the International Emergency Economic Powers Act ("IEEPA") and the federal money laundering statute.

2.      The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to violations of IEEPA, codified at 50 U.S.C. § 1701 *et seq.*  In addition, the Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in, and traceable to violations of IEEPA, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A).

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

4.      Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of Columbia.  The Defendant Funds are currently in two bank accounts at banks in the United States (U.S. Bank 1 and U.S. Bank 2).  The coconspirators (identified below) failed to seek licenses from the Office of Foreign Asset Controls ("OFAC"), which is located in Washington, D.C., for conducting transactions with these funds, in violation of U.S. law.  Venue is also proper pursuant to 28 U.S.C. § 1355(b)(2), because at the time the transactions and seizures occurred, the properties were part of a compound transaction that began in a foreign country.

## STATUTORY FRAMEWORK

**I.      THE IEEPA AND RELATED EXECUTIVE ORDER REGARDING SYRIA.**

5.      This civil forfeiture action relates to violations of the regulations and Executive Orders issued pursuant to IEEPA, codified at 50 U.S.C. § 1701 *et seq.*  IEEPA gives the President certain powers, defined in Section 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations thereunder.  See 50 U.S.C. § 1705(a).  A conspiracy to violate IEEPA is prohibited by 18 U.S.C. § 371.

6.      According to Executive Order (hereinafter "E.O.") 13582, "Blocking Property of the Government of Syria and Prohibiting Certain Transactions With Respect to Syria," all property and interests in property of those individuals and entities designated by E.O. 13582, which are in the United States, which hereafter come into the United States, or which are or hereafter come within the possession of a United States person, are blocked.

7.      Entities designated by E.O. 13582 include (i) the Bashar al-Assad led Government of Syria, including all of its agencies, instrumentalities, and controlled entities; (ii) any person determined by the Secretary of the Treasury "to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, any person whose property and interests in property are blocked pursuant to" E.O. 13582; and (iii) any person determined by the Secretary of the Treasury "to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to" E.O. 13582.

8.      In effect, these authorities bar any and all blocked transactions from using United States dollars (hereinafter "USD"), including through correspondent banking transactions occurring in whole or in part in the United States.

9.      Additionally, any transaction within the United States which evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in E.O. 13582 is similarly prohibited.

10.     IEEPA makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of E.O. 13582.

## II.      MONEY LAUNDERING STATUTE.

11.     Pursuant to 18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) it is a violation to transport, transmit, and transfer, and attempting to transport, transmit, and transfer a monetary instrument or funds, *inter alia*, to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

12.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes a violation of IEEPA.

13.     Pursuant to 18 U.S.C. § 1956(h), it is a violation to conspire to violate Section 1956.

## III.     THE FORFEITURE STATUTE.

14.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of IEEPA is subject to forfeiture.

15.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to civil forfeiture.  Forfeiture pursuant to this statute applies to a larger class of property than forfeiture under 18 U.S.C. § 981(a)(1)(C) because it applies to more than just the proceeds of the crime. Money laundering forfeiture is required for all property "involved

in" the crime, which can include clean or legitimate money that is comingled with tainted money derived from illicit sources.

## FACTS GIVING RISE TO FORFEITURE

### I.    BACKGROUND

#### A.    The Syrian Regime.

16.    Syria has been designated a State Sponsor of Terrorism since December 1979. Additional sanctions were added in May 2004 via E.O. 13582.  Subsequent Executive Orders have imposed additional sanctions targeting, among others, the President of Syria, Bashar al-Assad.  On May 18, 2011, the U.S. Department of Treasury designated Assad and his chief lieutenants for human rights abuses, including repression against the Syrian people, as well as benefitting from rampant corruption.

17.    In 2011, prior to the unrest caused by the civil war, Syria was the largest fuel producer in the Eastern Mediterranean region, producing approximately 400,000 barrels of oil and gas per day.  This revenue accounted for approximately 25% of the Syrian government's revenues and provided essential fuel for Assad's military.  Estimates from 2014 indicate Assad's oil and gas production dramatically decreased to approximately 25,000 barrels per day, resulting in billions of dollars of lost revenue.  Syria has attempted to make up this deficit in fuel through imports from Iran, Iraq, and Russia, often using commercial companies as intermediaries.  The U.S. Department of Treasury has designated many of the companies that have facilitated oil and gas shipments to the Assad Regime.

#### B.    Background on Cyprus Oil Transshipment.

18.    The geography and political dynamics of Cyprus make it uniquely positioned as a key intermediary between Russia, Europe, and the Levant.  Cyprus is located in the Eastern Mediterranean Sea, approximately 100 miles by sea from Turkey, Lebanon, and Syria.  Cyprus is

a member of the European Union, giving it the ability to freely distribute products in major European markets.  In 2012, the U.S. Department of State recognized Cyprus as a high risk jurisdiction for money laundering.

19.     In 2011, key offshore oil fields were discovered near Cyprus, making it a major petroleum hub.  There are many offshore oil platforms in the vicinity of Cyprus.  Crude oil from these platforms is transported to petroleum hubs via crude oil tankers.  Crude is then refined and transported to nearby oil terminals.  An oil terminal is an industrial facility for the storage of oil and/or petrochemical products.  From terminals, petroleum products are transported onto petroleum product tankers, which are different than the tankers that carry crude oil.

20.     Oil tankers take on new assignments as they become available.  As used in the industry, a "shipowner" of an oil tanker owns and operates its vessel, mainly focusing on maximizing freight.  A "charterer" of a tanker is a party that has cargo that it needs to ship.  "Brokers" interact with shipowners and charterers to arrange for the shipment of cargo.  Also, when a ship calls at a foreign port, the shipowner or charterer often employs the services of a port agent.  A "port agent" is an organizer that provides logistics services, including handling language issues, delivering and sending mail, providing currency conversion, completing paperwork, and booking port services.

21.     According to the Cyprus Port Authority, there are three major ports in Cyprus, namely the ports of Limassol, Larnaka, and Vassilikos.  Each of these ports has an oil terminal.  The Cyprus Port Authority publically publishes arrivals and departures from these ports.

**C.     Russian Company Sovfracht's Prior Syrian Business Dealings.**

22.     Sovfracht is one of the largest independent freight forwarders in Russia, providing transport and logistics services with a focus on rail transportation and oil products.

23.     On October 22, 2011, approximately one week after the United Nations convened to discuss Syrian sanctions and after the United States' sanctions were in place, Sovfracht attempted to send approximately $128,635.96 to an individual in Syria (Syrian Person 1).  This transaction passed through a U.S. correspondent account, leading the U.S. financial institution that processed the transaction to reject this transaction pursuant to the sanctions on Syria.

24.     Sovfracht wired this transaction from a bank account at a bank in Russia (Russian Bank 1).  Russian Bank 1 has publically disclosed that one of its key functions is servicing one of the largest Russian oil companies.

25.     One week later, Sovfracht wired the same amount to another individual in Lebanon with the same details as the prior transaction, including the same referenced purchase order and related dates.  This new transaction contained one critical addition to the prior wire detail.  It listed Syrian Person 1 as the recipient in the wire instructions indicating that Sovfracht used the new Lebanese recipient as a pass through to circumvent the Syrian sanctions and deliver the previously rejected transfer to Syrian Person 1.  This transfer is illustrative of Sovfracht' s business interests in Syria and its intent to violate sanctions against the Assad Regime.

### D.     Petrolina's Cypriot Business and its Uses of Affiliates as Port Agents in Cypriot Ports.

26.     Petrolina is the largest oil company in Cyprus, dealing in a wide range of petroleum operations.  According to its website:

> The company [Petrolina] imports distilled products from refineries located in the Mediterranean and the Black Sea. In order to bring those quantities to Cyprus, the company charters a modern, double-hull tanker on a long-term basis.   All products meet the most stringent European and local specifications.  To ensure quality, the company tests each import at accredited laboratories before releasing the products to the consumer.

27.     "Petrolina Ocean" is the name of a tanker used by Petrolina.

28.     Petrolina also owns, through an affiliate, Petrolina Ocean. That is, a publically available maritime registry reflects that Petrolina Ocean is owned by a company named Lefkaritis Bros Ocean, which is closely related to Petrolina. Seven of the ten directors of Petrolina have the surname "Lefkaritis." Lefkaritis Bros Ocean is on the banner of Petrolina's website. In certain business listings, Lefkaritis Bros Ocean lists Petrolina in its email and website contact information. A related company, "Lefkaritis Bros Ltd.," lists the same P.O. Box as Petrolina for its address.

29.     Petrolina has oil terminals at the Cypriot ports of Larnaca and Vassilikos.

30.     When an oil tanker makes a port visit in a Cypriot port, in addition to listing the date and time a vessel arrives and departs, the Cyprus Port Authority also lists the port agent who handled the shipment.

## II.     SOVFRACHT WIRED PETROLINA THE DEFENDANT FUNDS IN VIOLATION OF U.S. SANCTIONS.

31.     On January 12, 2016, Sovfracht, using trade name "JSC SVH-Freight," sent $1,312,500.00 to Petrolina. The wire details state that the payment was "for the supply of fuel." Publicly available business listings associate Sovfracht to this trade name and wire transfers from Sovfracht and JSC SVH-Freight list the same address. Because Sovfracht sent this payment in U.S. dollars, this transaction passed through a correspondent bank account in the United States.

32.     On January 13, 2016, Sovfracht sent an additional $1,272,840.45 to Petrolina. The wire details state that the payment was "for the supply of fuel." Because Sovfracht sent this payment in U.S. dollars, this transaction passed through a correspondent bank account in the United States.

33.     As noted above, the funds in these wire transfers constitute the Defendant Funds.

34.     These two payments from Sovfracht to Petrolina fail to correspond to any departure from Cyprus by a vessel served by a Petrolina company that could have been for the supply fuel for any appropriate Sovfracht business purpose.  In actuality, as discussed below, Sovfracht wired the Defendant Funds to Petrolina as payment for Petrolina providing fuel to the Assad Regime in violation of the U.S. sanctions.

A.     **Background on Geolocational Data Recorded on Large Tonnage Ships.**

35.     Law enforcement analyzed activity near the Cypriot Port of Vassilikos.  One of the methods used to track vessels at this port was through geolocational data submitted via the Automated Identification System (AIS).

36.     AIS was developed in the 1990s as a maritime safety feature which exchanges vessel information electronically with other nearby ships. The system is used by watch-standing officers and other maritime authorities for collision avoidance, identification and vessel locational data. Shipboard AIS became a requirement based on the International Maritime Organization's International Convention for the Safety of Life at Sea on specific vessels as of December 31, 2004.

37.     AIS is required on all ships over 300 gross tonnes (GT) and cargo ships over 500GT not engaged in international voyages. It must also be functional on all passenger ships regardless of size.  AIS acts like a transponder that transmits ships information (based on GPS) via a VHF radio.  The system provides a ship's identity, type, position, course, speed, and navigation status.  The system broadcasts less frequently for slow moving vessels.  Signals are received by AIS transponders fitted on other ships or land based systems.  The system is capable of handling over 4,500 reports per minute and updates every two seconds.

**B.**     **Records Reflect that Sovfracht Wired the Defendant Funds to Petrolina In Connection with the Activities of Russian Tanker Mukhalatkaa.**

38.     According to the Cyprus Port Authority records, Petrolina's affiliate, Lefkaritis Bros Ocean Ltd., acted as port agents for three tankers during the time period relevant to this complaint: namely: (i) the Petrolina Ocean (which is owned by Lefkaritis Bros Ocean, as stated above); (ii) the Adriatic Mariner, a Maltese vessel; (iii) and the Mukhalatka, a Russian vessel.

39.     Law enforcement analyzed these three vessels using AIS and publicly available data sources, and cross referenced against the timing of the wires of the Defendant Funds.

40.     Unlike the Adriatic Mariner and the Petrolina Ocean, the Russian tanker Mukhalatka had a shipment at the time of the transfer of the Defendant Funds, which appears related to the transfer due to the origin of the vessel and the timing of its movements.

41.     The Russian tanker Mukhalatka departed the Cyprus port of Vassilikos on January 13, 2016, which is consistent with the timing of the wires of the Defendant Funds (January 12 and 13, 2016) from Sovfracht.

42.     This tanker traveled from Cyprus again on January 22, 2016.  Publicly available information indicates that this tanker later arrived at a Greek port on January 30, 2016. Traveling to this Greek port from Cyprus, however, typically does not take eight days.  Indeed, the Adriatic Mariner was able to make nearly an identical trip in or around the same period of time in only three days.

43.     A comprehensive analysis of AIS transponder activity on the Mukhalatka revealed consistent signal loss and gain patterns over the course of a dozen shipments primarily occurring around or near the Cyprian coast.  This pattern of activity, which is further detailed below, indicates that the Mukhalatka likely disabled its AIS equipment so that locational data

would not be broadcast, in part to conceal its location.  This action is consistent with the making of an illicit intermediate port call.

44.     After Sovfracht wired the Defendant Funds to Petrolina, the Adriatic Mariner travelled to Aspropyrgos, Greece. AIS data reveals that the Adriatic Mariner consistently travels a standard route between Greece and Cyprus.  The Adriatic Mariner did not travel in a manner consistent with the wiring of the Defendant Funds

45.     Similarly, Petrolina's own ship, the Petrolina Ocean, did not travel in a manner consistent with the wiring of the Defendant Funds.  Petrolina Ocean consistently travels a standard route between the Greek oil terminal Skaramagas, Cyprus oil terminals, and the Israeli port Haifa.

**C.     The Russian Tanker Mukhalatka Docks at Port Vassilikos on January 13, 2016, Travels towards Syria, and Disables Geolocation Equipment to Avoid Detection.**

46.     Between 2013 and 2014, the Mukhalatka appears to have primarily operated in the Black, Azov, and Caspian Seas.  This vessel began making trips to the Mediterranean Sea in July 2015 and the Cypriot Port Vassilikos in October 2015.   After starting activity in the Mediterranean, this vessel appears to have taken steps to hide its activities, consistent with a vessel traveling to designated ports, as further described below.

47.     Details concerning the Mukhalatka's movements after Sovfracht wired the Defendant Funds to Petrolina confirm that it made a port visit in Syria.

**i.     Mukhalatka's Geolocation Information Indicates It Took a Hidden Voyage to Syria.**

48.     The International Tonnage Certificate for the Mukhalatka indicates that it is 4,754 GT.  AIS equipment is required for such vessel.  In fact, as described below, the Mukhalatka has typically employed AIS equipment in its travels.

49.     AIS data reflects that Mukhalatka docked at the Vassilikos oil terminal on January 11-13, 2016, which is consistent with the above noted Cyprus Port Authority data, and the timing of the wiring of the Defendant Funds.

50.     AIS data shows that the Mukhalatka's AIS transponder stopped sending its geolocation data on January 13, 2016, near the port of Vassilikos.

51.     The Mukhalatka's AIS transponder started functioning again on January 16, 2016, while off the coast of Cyprus heading towards the Cypriot port of Vassilikos.  Law enforcement analyzed the ship's speed, distance to nearby ports with oil terminals, time to dock-offload-make way, return trajectory, and other data to determine where the vessel docked during the 80 hours the AIS was not functioning. This analysis reveals that Mukhalatka traveled to one of the Syrian ports controlled by the Assad regime.

**D.     The Mukhalatka Has a History of Making Covert Port Visits in Syria.**

52.     A historical analysis of the AIS transponder data for the Mukhalatka revealed a pattern of the Mukhalatka appearing to turn off its AIS transponder after docking at Cypriot port Vassilikos, often in route to Syria; however, when the Mukhalatka traveled to non-sanctioned destinations in Greece, the AIS transponder was kept on.

53.     Between October 2015 and March 2016, the Mukhalatka docked on approximately eleven occasions at the Cypriot port of Vassilikos or two Greek ports.  The Mukhalatka appears to have turned off its AIS transponder for several hours, and then later reactivated it off the Cyprian coast.  On some occasions, the AIS data indicates that the Mukhalatka was heading in the direction of Syria.  Based on the amount of time elapsed after the transponder was turned off and the location of the ship at that time, it appears that the Mukhalatka has made many concealed voyages to the three Syrian ports identified above.  On repeated occasions, before/after the Mukhalatka is suspected of traveling to Syria, the AIS

transponder reactivated when the Mukhalatka was outside of proximity to Syria and traveling to non-sanctioned destinations, such as Greek or Cypriot ports.

54.     In summary, the Mukhalatka appears to have docked at the Cyprus port of Vassilikos approximately two times per month from October 2015 to February 2016, and then once in March 2016.  Petrolina affiliate Lefkaritis Bros Ltd was the agent for the Mukhalatka for these port visits.

55.     Based on the above activity, law enforcement believes the Mukhalatka made frequent trips to the Syrian Coast during this time.  Because Syria is designated, the Mukhalatka would need to shut off its AIS to conceal that it was traveling to sanctioned ports to support the sanctioned Syrian regime.

56.     Additionally, it appears that Sovfracht has used the Mukhalatka since March 2014 for Russian military contracts.  That is, the Moscow Arbitration court published a decision that involved Sovfracht's past dealings with the Russian tanker Mukhalatka.

57.     This decision indicates that Sovfracht entered into a contract on March 28, 2014, for the transport of diesel fuel from the Northern Caucasus area for the Russian Black Sea Fleet Defense Ministry in support of State Contract Number 84 / L-PP-15.  AIS data corroborates that the Mukhalatka operated in this area during 2014.

58.     In conclusion, the Russian company Sovfracht wired the Defendant Funds to Cypriot company Petrolina on January 12 and 13, 2016.  Petrolina's affiliate company serviced the Russian oil tanker, the Mukhalatka, in Cyprus during this time.  Other vessels serviced by Petrolina or its affiliates at this time went to either Greece or Israel, which is inconsistent with the context of the wire.  After Petrolina's affiliate serviced the Mukhalatka, this oil tanker turned off its GPS equipment for approximately 80 hours.  Analysis indicates this vessel traveled to a

Syrian port subject to sanctions during this time.  Additionally, the Mukhalatka has a pattern of keeping its GPS equipment on while traveling to non-sanctioned ports in Greece, but turning GPS equipment off while traveling towards Syria.  Sovfracht has prior business dealings with Russian oil tanker Mukhalatka and prior business dealings with an individual in Syria.  Based on these facts, the Defendant Property is traceable to a shipment of petroleum products to a sanctioned entity and therefore is subject to forfeiture.

## COUNT ONE -- FORFEITURE
### (18 U.S.C. § 981(A)(1)(C))

59.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to **Error! Reference source not found.** above as if fully set forth herein.

60.     Sovfracht, Petrolina, the Mukhalatka, and others known and unknown acted individually and conspired together to conduct the above identified illegal procurements, payments, and exports, in violation of IEEPA, specifically 50 U.S.C. § 1705 and the conspiracy statute, 18 U.S.C. § 371.

61.     As such, the defendant properties are subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a conspiracy to violate IEEPA.

## COUNT TWO -- FORFEITURE
### (18 U.S.C. § 981(A)(1)(A))

62.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to **Error! Reference source not found.** above as if fully set forth herein.

63.     Sovfracht, Petrolina, the Mukhalatka, and others known and unknown acted individually and conspired to transmit and transfer the $2,585,340.45 defendant property to a place inside the United States from or through a place outside the United States, with the intent

to promote the carrying on of violations of the IEEPA, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A).

64.     As such, the Defendant Funds are subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2)(A), or as any property traceable to such property.

*     *     *

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the United States of America prays that notice issue on the defendant

properties as described above; that due notice be given to all parties to appear and show cause

why the forfeiture should not be decreed; that judgment be entered declaring that the defendant

property be forfeited to the United States of America for disposition according to law; and that

the United States of America be granted such other relief as this Court may deem just and proper,

together with the costs and disbursements of this action.

Dated: September 6, 2016
      Washington, DC

                                   Respectfully submitted,

                                   CHANNING D. PHILLIPS, D.C. Bar #415793
                                   United States Attorney

By:          /s/
                                   ZIA M. FARUQUI, D.C. Bar No. 494990
                                   DEBORAH CURTIS, CA. Bar No. 172208
                                   BRIAN P. HUDAK, NY Bar
                                   Assistant United States Attorneys
                                   555 Fourth Street, NW
                                   Washington, DC 20530
                                   (202) 252-7566 (main line)

                                   *Attorneys for the United States of America*

## <u>VERIFICATION</u>

I, Joseph Hugdahl, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 6<u>th</u> day of September, 2016.


_____*/s/ Leland Abraham*_____
Leland Abraham
Special Agent
Federal Bureau of Investigation